[Crim. No. 1491.   Fourth Dist.   Dec. 1, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. JOE LUIS FLORES, Defendant and Appellant.

Richard S. Henderson for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—Defendant and appellant Joe Luis Flores was jointly charged with defendant Elizabeth Barron in count one with conspiracy to commit grand theft (Pen. Code, § 182, subd. 1) and in count two with grand theft (Pen. Code, §§ 484 and 487, subd. 1) committed as follows: Between February 29, 1960, and September 30, 1960, they feloniously took personal property from the County of San Diego consisting of money in excess of $200. In a third count, Elizabeth Barron was charged with presenting false claims (Pen. Code, § 72) in reference to her eligibility to receive Aid to Needy Children welfare assistance, in that she stated that no unrelated adults were living with her and her family when in truth and in fact defendant Flores was doing so.

Elizabeth Barron entered a plea of guilty to the charges. Defendant Flores pleaded not guilty and, after a jury trial, was acquitted on the conspiracy charge and found guilty on the grand theft charge. He was given five years' probation, with conditional jail sentence and a condition for restitution. He appeals from the judgment and claims that he (1) committed no crime under California law as it now exists and did not aid or abet his codefendant in obtaining the welfare money (citing *People* v. *Dole*, 122 Cal. 486, 492 [55 P. 581,

68 Am.St.Rep. 50] ; *People* v. *Malotte,* 46 Cal.2d 59, 65 [292 P.2d 517], and dissenting opinion in *People* v. *Shirley,* 55 Cal.2d 521 [11 Cal.Rptr. 537, 360 P.2d 33]) ; (2) that the accomplice's testimony was uncorroborated; (3) that the regulations of the Department of Social Welfare upon which the charge is based are void; and (4) that the probation order required him to restore more money than he took and was unreasonable and oppressive.

Defendant was a marine stationed at Camp Pendleton in January of 1959 when he met Elizabeth Barron. She was married but separated from her husband. She had three children and had been married twice before. Two weeks after they met, defendant started spending week ends at her rented home. She was drawing Aid to Needy Children money through the welfare department on the basis of her home being occupied only by herself and her three children. On February 17, 1959, she signed a similar eligibility statement as part of the annual reevaluation survey. On July 24, 1959, defendant left the marines and began living with her more or less on a permanent basis. Between these times, Elizabeth discussed the welfare aid she was receiving and he knew the circumstances under which she was receiving the aid. She became pregnant by defendant and they discussed the question of her support and that of the child. Defendant told her that as long as she was "under welfare . . . the welfare could do it," that is, support his child too. In testifying against defendant, Elizabeth stated that she did not at any time report defendant's presence in her home; that when company came or the welfare investigators came, he would hide in some other room of the house; and that at times she kept his clothes at a neighbor's. On August 9, 1959, Elizabeth applied for and received additional aid on account of her unborn child and she claimed defendant was the father of it. She stated that defendant did not live in the home. At the trial, she testified that she discussed this matter with defendant and told him she was not supposed to receive aid from the county for this; that she would get in trouble, but defendant said for her to "continue getting money." He refused to obtain employment. The entire income for the household was from welfare checks. She paid the rent and he took his meals there. The baby was born on October 21, 1959.

Elizabeth Barron testified that they quarreled considerably about his not working or supporting his child; that he took occasional trips away from the home; that in February 1960

she was called upon to make another yearly reevaluation report and that she again signed a false statement that defendant was not living there.

In September 1960, she filed a failure to provide charge against defendant for his child and defendant pleaded guilty to the charge. She then told the district attorney what had been going on all this time and her entire welfare check was withheld. From January 1959 to October 1960 she received warrants from the county. In August 1959 she was receiving $215 per month. In September it was increased to $248; in November, to $256; and it remained at that figure until September 1960. If an unrelated adult lived with the family, her aid would have been $161 in August and $174 in September. In November it would have been $165 and remain at that figure. The total overpayment was $1,685. See Welfare and Institutions Code, section 1511.

A welfare worker and district attorney's investigator testified and corroborated much of this evidence. In September 1960 they called on Elizabeth and found defendant in the home in bed, clad in shorts and sound asleep. Both defendant and Elizabeth contended that defendant had been away and had just returned. Later, both defendant and Elizabeth admitted that defendant had been there, more or less, all of the time. Defendant said he just couldn't find a job and admitted that he knew Elizabeth was on welfare and that he knew that at the time he moved in, and that he knew Elizabeth should have reported his presence.

Further corroboration was furnished by the sister-in-law of Elizabeth and her husband who lived next door to them. She testified that defendant "acted like he was the husband, and that is the way she treated him."

Defendant, in defense, testified that he did visit her on week ends while in the service and that thereafter he lived with her; that she became pregnant; that he doubted his being the father but that he was later convinced the child was his; that he could not find a job and was receiving unemployment wages for six months at $32 a week and gave that sum all to her; and that he did not find out that she was on welfare until she became pregnant and he never told her to apply for aid for his child.

### GRAND THEFT CHARGE

Elizabeth pleaded guilty to the grand theft charge of which defendant was convicted. The evidence fully justi-

fies the finding of the jury that defendant aided and abetted her in taking money in excess of $200 under that charge. (*People* v. *Bond,* 13 Cal.App. 175, 185 [109 P. 150] ; *People* v. *Malotte, supra,* 46 Cal.2d 59, 65.)

It is true that the gravamen of the offense was the concealment of his presence in the home. By the concealment, the household was able to secure additional funds that they thought they would not otherwise obtain. It is also true that the representation of this falsity was made by Elizabeth Barron, over a period of time. No questions are raised as to the fact of the misrepresentation being made by her or that it was false. Defendant contends that his mere presence in the home does not make him an aider or abettor. The evidence reveals far more than mere presence in the home. Defendant knew that welfare payments were being made into the home. He knew his presence, if revealed, would reduce those payments. When his child was born to Elizabeth, he told her to seek support for it from the government. He hid when there were visitors, to make his presence inconspicuous. He did not work, but ate food and used a shelter furnished by funds for needy children. Under these circumstances, he was as responsible for what was done as the person who actually made the representations. The evidence was sufficient to support defendant's conviction. (*People* v. *Phipps,* 191 Cal. App.2d 448 [12 Cal.Rptr. 681] ; *People* v. *Bailey,* 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39] ; *People* v. *Shirley, supra,* 55 Cal.2d 521.)

### CORROBORATION

The testimony of Elizabeth Barron was sufficiently corroborated by other witnesses and was sufficient to satisfy Penal Code, section 1110. (*People* v. *Lyons,* 50 Cal.2d 245, 258 [324 P.2d 556] ; *People* v. *Griffin,* 98 Cal.App.2d 1, 25 [219 P.2d 519].)

### REGULATIONS

■ Defendant's counsel claims that the jury was instructed, as in *People* v. *Shirley, supra,* 55 Cal.2d 521, 525, under Welfare and Institutions Code, section 1508, and the regulations of the State Board of Social Welfare, to the effect that the welfare department is authorized to consider the income of a stepfather in computing the amount of aid to be granted, and that it is unlikely that the financial need of a child will vary substantially depending upon the legality of the relationship between his mother and a man living in

the home and assuming the role of spouse. This section and kindred sections and regulations pertaining thereto were held in the *Shirley* case to be proper and valid. The jury instructions were not brought up with the record. Even so, it might well appear that the jury was fully informed of the elements of the offense of theft by false pretences. No prejudicial error appears. (*People* v. *Shirley, supra,* 55 Cal.2d 521.)

■ Some reference is made to the record in regard to the return of the jury for further instructions in reference to the testimony of a welfare investigator as to what the welfare department's regulations provided under a given set of circumstances. The court instructed the jury that they were to take the law as given by the court to guide them and not the regulations to guide the welfare workers. The instructions are not before us and we cannot assume any void regulation was presented or read to the jury. (*People* v. *Pierre,* 178 Cal. App.2d 585, 594 [3 Cal.Rptr. 290].)

### CONDITIONAL PROBATION—RESTITUTION

■ Lastly, complaint is made as to the conditions of probation. The trial judge recited in the probation order that defendant and Elizabeth Barron were jointly and individually responsible for restitution to the county in the sum of $1,685 and that defendant's share thereof was established at $842.50. But, in case Elizabeth defaulted in the payment of any portion required of her to repay under the probation order (which orders appear to be reciprocal), defendant shall become liable for such portion, payable $25 per month through the probation officer, and that defendant assume full financial support for his minor child.

Defendant argues that he should be liable for only his one-half of the total, at the most, and not be held liable for his codefendant's one-half or for her omissions. The court concluded that the total loss by theft by both defendants, acting in concert, amounted to $1,685. The jury did not find the exact amount taken, but found it to be in excess of $200. It appears to us that the full amount ordered repaid has evidentiary support. Prosser on Torts (2d ed. 1955) section 45, page 225, holds:

"Where two or more persons act in concert, it is well settled both in criminal and in civil cases that each will be liable for the entire result." See also *Gray* v. *Sutherland,* 124 Cal. App.2d 280, 290 [268 P.2d 754]; *Reid* v. *Robinson,* 64 Cal. App. 46, 58 [220 P. 676]. Restitution or reparation as a con-

dition of probation is expressly authorized by statute (Pen. Code, § 1203.1) and is sanctioned by case authority (*People* v. *Marin,* 147 Cal.App.2d 625, 626 [305 P.2d 659]).

If the facts and circumstances indicate any error in the amount of restitution ordered or an injustice appears, the trial judge, upon proper application for modification of the terms of probation, is authorized to modify his original order (*People* v. *Marin, supra.*)

Judgment (order granting probation) affirmed.

Shepard, J., and Coughlin, J., concurred.